DEAT HOLT v. THE STATE.

No. 1512. Decided May 18, 1898.

Motion for Rehearing Decided June 24, 1898.

1. **Recalling and Resubmitting Case Before Possession of Charge Has Been Delivered to Jury—Practice.**

Where the indictment contained three counts, and the court had read its charge submitting only one of said counts, and defendant moved the court to instruct a verdict for defendant because the count submitted was fatally defective; whereupon the court recalled the submission and prepared and read to the jury a new charge predicated upon a different count of the indictment; Held, the original charge not having been delivered into the possession of the jury, it was competent and legal for the court, when he became apprised of the defect in the count submitted, to recall the submission and resubmit the case upon any other good count.

2. **Motion in Arrest—Misspelling Name.**

Where the count upon which defendant was convicted alleged the name of the principal as "Rubbottom," and subsequently referred to said principal as "Rubotton," Held, that the variance, not being calculated to mislead or confuse any one, did not afford any ground for motion in arrest of judgment.

**3.   Evidence—Extraneous Crimes—Charge Limiting and Restricting.**

Whenever extraneous crimes are introduced in evidence and there might be any danger of the jury's convicting for such extraneous crimes, the court should limit the effect of such testimony to the purpose for which it was introduced.

**4.   Codefendants—Evidence as to Their Arrest.**

On a trial of one codefendant, it is not error to prove the arrest and place of arrest of the other codefendants after their separation from defendant.

**5.   Cross-Examination of a Codefendant.**

A codefendant who had been acquitted, and who had, as a witness for defendant, testified in contradiction of the testimony of an accomplice, was asked on cross-examination if he had testified on his own trial. Held, an objection that this would compel the defendant to take the witness stand in his own behalf, was without merit.

**6.   Evidence—Systematic Crime.**

On a trial for theft of money, testimony of an accomplice that defendant had advised him to steal money from his (the accomplice's) father, and that on one occasion prior to the theft for which defendant was on trial, he (the accomplice) had stolen $40 from his father, was admissible as showing a system and plan and concerted scheme by the parties to commit such thefts.

**7.   Theft—Recent Possession and Reasonable Explanation—Charge.**

Where an accomplice to theft is on trial, and it is shown that he was clearly cognizant of the theft and all the circumstances connected with the transaction, and was in fact a particeps criminis, it was not error for the court to refuse to charge the jury as to his explanation of his possession of a portion of the stolen money, especially where he made no explanation consistent with his innocence.

**8.   Evidence of Acts and Conduct of Defendant When Not in Arrest.**

Evidence of the fact that defendant "tucked his head" when he was first informed of the arrest of his codefendant for the offense was properly admitted, he, defendant, not then being in arrest.

ON REHEARING.

**9.   Evidence—Acts and Conduct of Coconspirators.**

On a trial for theft, where it was shown that, as a part of the conspiracy to commit the theft, the money stolen was afterwards to be invested in Arizona, testimony that, after the commission of the theft, two of the coconspirators were arrested after they had gone from the place of the theft some twenty-three miles en route to Arizona, was admissible, as the act of going to Arizona was embraced in the conspiracy. Jump v. State, 11 Southwestern Reporter, 461, distinguished.

**10.   Same—Evidence of Prior Crimes of Like Character.**

On a trial for accomplice to theft of money committed in December, testimony that the principal to the theft had committed a similar theft previously in the month of May, was admissible, where it was made to appear that defendant suggested said prior theft, knew of it and how it was committed, and discussed it and insisted that the proposed new theft be committed in the same manner.

**11.   Evidence—Acts, Conduct, and Declarations of an Acquitted Coconspirator.**

In all cases, except where a party is charged specifically with the distinct substantive offense of conspiracy, and where it appears that the offense charged was in pursuance of a conspiracy, the acts and declarations of one shown to have been engaged in the conspiracy to commit such offense are admissible in evidence, notwithstanding such coconspirator, whose declarations are sought to be admitted, has previously been acquitted.

**12.   New Trial—Newly Discovered Evidence.**

A new trial will not be granted for newly discovered evidence to impeach a witness.

APPEAL from the District Court of Taylor.  Tried below before Hon. T. H. CONNER.

Appeal from a conviction as accomplice to theft; penalty, two years imprisonment in the penitentiary.

On the 12th day of March, 1898, appellant was indicted for the theft of $350 in money from one W. F. Rubottom.  The indictment contained three counts.  The first charged appellant with receiving the money from Z. Rubottom, a son of W. F. Rubottom, the said Z. Rubottom having stolen the same, and appellant received it, knowing it to have been stolen. The second count charged appellant with being a principal in the commission of the crime.  The third count charged appellant with being an accomplice with Z. Rubottom, in the commission of the theft.  The court first submitted to the jury the first count in the indictment, and afterwards, as shown below, withdrew his charge and submitted only the third count, charging appellant with being an accomplice, and on this count defendant was convicted and sentenced to two years in the penitentiary, from which judgment this appeal is prosecuted.

The appellant filed motion in arrest of judgment, which was overruled. The appellant contends that the third count in the indictment is fatally defective and is insufficient to support a conviction for two reasons:

1.  There is a fatal variance in the indictment in this, to wit:  An attempt is made to charge the taking of the property from W. F. Rubottom, and after alleging the property to be the property of W. F. Rubottom, the indictment says without the consent of the said "W. F. Rubotton;" and in that part of the third count, charging appellant with encouraging the theft, the indictment says "which the said 'Z. Rubotton' had stolen," etc.

2.  In that part of the third count wherein the pleader attempted to charge appellant with encouraging the theft, the charging part begins a new, separate, and distinct count.

On motion of defendant, a severance was granted, and his codefendant, Will Holt, separately indicted for the same offense, was first tried.

The case will be thoroughly understood from the testimony of Z. Rubottom, the principal in the theft, who turned State's evidence and testified on the trial as follows, viz:  That he was the son of W. F. Rubottom, and lived in Buffalo Gap, Texas, and knew defendant Deat Holt, and Ell Carter and Will Holt.  That he was 16 years old and would be 17 next July.  That in May or June, 1897, he stole $40 in gold from his father, W. F. Rubottom.  "I was working in the printing office and father was sick, and I went in his room; he always kept his money under his head, and had taken his pants out and some money dropped out in a package, and I took the package in the office; and the paper on the end was worn and a $20 gold piece dropped out, and then another $20 in gold. At first I did not intend to steal it, but after I got it I concluded to keep it.  Prior to this time I had several conversations with defendant in regard to the money.  I do not know when they occurred, but one time he asked me if my father was rich, and I told him not, and he asked me if

he didn't have a great deal of money, and I told him perhaps a hundred dollars, referring to what he had in the house. Defendant asked me if my father ever gave me any money. I told him my father gave me very little spending money, and defendant said if he were me he would help himself, or something to that effect. I suppose the first conversation was in January or February, 1897, about the money. I had several more after this before I got the $40, and they were about the same. The next morning after I took the money defendant came by our place going to town, and I called him and sent to town for something, and defendant asked me where I got so much money, and I told him I would tell him when I got time. He bought what I sent for, and I am not sure I then told him I stole it or not, and we made arrangements to meet that night on the creek, where I would tell him all about how I got it. I then told him all about it. The creek was just west of our place. Defendant asked me how much I supposed was there, and I told him one or two hundred dollars, and he asked me why I did not take more, and I told him I did not like to steal and was afraid I would be found out, and I told him I did not intend to take the $40 until I had gotten it. Defendant said, as there was that much, he would take more. Defendant asked me what I was going to do with it, and I told him I was going to spend it for some things I wanted, including clothes and a fiddle, and defendant told me I ought to spend it for something that would benefit me. When I took the $40 I am not sure whether Will Holt and Ell Carter were in the Gap or not. A short time before Christmas Will Holt and Ell Carter returned from Arizona, and about the 1st of January, 1898, Deat Holt and Ell Carter came to the fence in front of our place and called me out, and Deat asked me if I knew where I got that money before. I said I did, and he asked me if I could get any more, and I told him I might if there was anything in the plan he proposed. He said if I would get some and let Will Holt and Ell Carter have it they could invest it for me in Arizona and give me half of the profits, and I told them I did not have any money, but could get some more, perhaps. He asked me to try. At another time after this, before I got the $90, I had another conversation with Will Holt, Ell Carter, and Deat Holt, and Will Holt agreed to the plan, that is, they would invest the money for me in Arizona. I promised them I would try and get the money, and they said if I could get some it would be a good thing for me. I had three or four conversations with them before I took the $90. I do not remember Will Holt being present but one time before I got the $90. I got the $90 from my father's pants pocket, about the middle of January, in the night time, when he was asleep. About daylight next morning I went up to Deat's (defendant's) house, where Ell Carter was staying, and I told defendant I had some money for him. I do not remember that I told them how much. Defendant said they would be up by my father's place next morning. Before this, I had played cards with them and lost my clothes and fiddle, and they agreed to let me redeem them for $15. When·they came by I paid Ell Carter the $15 to redeem my clothes. They went down

town and came back with Will Holt. They proposed we have a game; proposed to have a game and give me a chance to get even with what I had lost. I told them I was afraid I would lose all the money I had. Ell Carter said he was willing to play. I saw Deat (defendant) by himself, and he said if I would play he would stack the cards for me so I could win. I agreed to play, and we went to the creek and I lost $30 and quit the game. Ell Carter won the money. Will Holt dealt first and then defendant dealt. I went back to the house, and then in the evening the boys, Ell and Deat, came back to the creek and I played Ell Carter again, and lost the rest of the $90. We played poker. After the game something was said about me getting more money, and I think it was Ell Carter. I do not remember that anything more was said at this time about investing the money. No agreement was made about playing any more, but I believe defendant said if I would get some more money he would help me win. A few days after, Ell Carter suggested if I would get some more money he would invest it or give me a chance to get even playing Carter. Deat Holt was present. I told them I did not know whether I could get any more or not; and I was afraid to play, as I might lose it, and if I took any more it might be found out. I do not remember defendant Ell Carter saying anything when I told him I was afraid it might be found out. On the night of February 12th I took from my father's pocket $340 or $350, partly gold and partly greenbacks; $220 or $230 in gold. All the gold was in $20 gold pieces except one $10 gold piece. The $90 I lost prior to that time was $70 gold and $20 greenbacks. February 12th was on Saturday. I took the money about midnight. I had a conversation with defendant and Ell Carter about an hour by sun on the 12th at our front yard. Defendant said Will Holt and Ell Carter wanted to leave and were waiting for me to get some more money, and if I did not get it pretty soon, they would leave anyway. They said that Will Holt was at Merkel, waiting for Ell Carter. Before that Ell Carter said he wanted to leave Saturday morning, but would wait until Monday. In this connection, Ell suggested I play cards and get even on what I had lost, and I told him I did not care to play cards. I would rather let him have it to invest. Ell Carter was to sleep at defendant's house, and I was to come up and let them know if I got the money. Defendant's house was 150 to 200 yards. About 9 o'clock they came up and called me out and asked me if I was pretty sure to get the money, and I said I would try, and they said they would wait around the place awhile, and if I did not come out in an hour or two they would be at Deat's house. When I got the money I went up to Deat's house and woke them up. My father did not authorize me to take the money or give his consent. This all occurred in Taylor County, Texas, and the money was current money of the United States, and worth $350. When I waked the boys up defendant advised me to play cards, and said that he would stack the cards and help me win back all my losses. We went to my father's barn, and I got a lamp and counted the money. We began playing. Sometimes I was a little deal ahead and sometimes behind, and

finally lost all I had. Ell Carter won it. I asked Ell Carter to let me have some of the money back and he would not, and said if I got into any trouble about it he would help me out if he could. Deat said, 'We don't want to be seen here, and want to get away before day.' That morning, Sunday, 13th of February, my father missed the money. He asked me if I had gotten the money, and I said yes, and he told me to get it back. I told him I had loaned it to a man named Barker."

Cross-examination: "I have gone to school and stood well in my classes; studied grammar, arithmetic, history, physiology, and took several prizes at school. Last two years worked on my father's paper and set type, and acted as local editor. In last few years my father has kept me very close, and whenever I got away from home I slipped away. Deat Holt was at my father's fence when he asked me if my father was not rich. It was either the next morning or the morning after I took the $40, in May or June, that defendant was at our fence, when I gave him $5 to get me some things. The money I gave Deat Holt to take to town, I think, was $5. I had gotten a $20 gold piece changed by R. A. Hurt. He gave me one $10 and two $5 bills. Defendant asked me where I got so much money when I gave him the $5. He had not seen anything but the $5. In November last year I broke into Mr. Floyd's house and stole $17.50. I gave Mr. Giraud $5 of this money to send off for me. I do not know that I ever had a conversation with anyone about turning State's evidence. I testified on the examining trial, that 'I was testifying against these boys in order to save myself,' but I did not understand the question and asked it to be changed. I got the idea somewhere that if I testified it would save me, but I do not know where I got it. I may have heard it. I never had a conversation with my father nor the county attorney about turning State's evidence. I have willingly testified in this case, but did not want to in the burglary case against me. I have stole money from my father six times. At first when I was about 13 I stole $1.25, and about a year and a half ago 25 cents, and about a year ago about $1, and then the $40, and $90, and $350, as testified to before. The examining trial was Friday, February 18th. Will Holt was present two or three times when Deat and I were talking about getting the money. One time, I can remember, was the night of the entertainment at the college. Ell, Will, and Deat and myself came down from the college together. We stopped out west of the college, about half a hour, at a little grove. There were 200 or 300 people at the entertainment. Don't know whether it was ordinary or public entertainment. I do not remember the kind of entertainment. I testified on examining trial that this was 'three weeks last Friday night there was an entertainment at the college.' I don't know that that was the correct time. Ell, Will, and Deat were at the entertainment, and after it was over they askd me if I could get some money out west of the college near the little grove. I went to the college society' meetings several Friday nights in January. I did not take all the money when I got the $90 because I did not want to take so much. When I

took the last money I filled up my father's pocket, where the gold was, with sand and lead. I played cards with Ell Carter and Deat Holt twice before I took the $90, in my father's barn. We played at night. The first time I lost 50 cents in money and $3 in credit; and next time I lost a suit of clothes, fiddle, and hair clipper valued at $25, which the other boys said I could redeem at $15. I stole the $90 partly to redeem my clothes and partly to let the boys have to take to Arizona. Will Holt left Buffalo Gap on Friday. Defendant and Ell Carter came to my house that morning about 9 o'clock. Ell asked me if I had gotten any money for him, saying he was going to leave, but if I could get some he would not go away and would wait until Monday. When the boys came to our house the night I took the money, I first went to the door, returned to the room, and in two or three minutes after I went out. The last time I took about $350. I stole this money partly to get even on my gambling debts and partly to let the boys have to take to Arizona. I do not remember telling Will Holt, on the creek, in answer to his questions, that I had had the money a long time and had plenty of it, but may have done so. I confessed to the burglary case after they had caught me with the money. At first I implicated Mr. Johnson's boy in the burglary, but he was not in any way connected with it, and no bill was ever found against him so far as I know. I have never testified as to that case until this trial."

Redirect: "Just a short while before I took the $350, in a conversation with defendant, I told him I did not know what to do; I was already in it so deep. He told me to take the chances; that Ell had considerable money, and that he, Deat, the defendant, would help me win back my losses, and maybe I would win $400 or $500. When I took the $350 and went to where they were and told them I had gotten it, they got up and came out of the house, and then Ell proposed we play cards. I told them I was afraid I would lose. Defendant then whispered to me to play, that he would deal for me all right, and I agreed to, and did play. The times (three times) I took money I have told about, to wit, the $1.25, and $25, and $1, was money my father had let drop from his pocket around the place. Deat Holt, the defendant, taught me to play cards. I never played with anyone but he and Ell Carter. Never played poker but five times in my life prior to this gambling with defendant and Ell Carter. Had played a few games of 'smoot' for fun."

*J. M. Wagstaff, W. C. Lasley,* and *C. M. Christenberry,* for appellant. As to the first objection to the indictment, appellant insists that the names Rubotton and Rubottom are entirely distinct and separate names. They are not idem sonans, but are entirely distinct persons in law. The allegations are, that the property was taken without the consent of a different man to the alleged owner, and hence no offense is charged against anyone. The error is more fatal and apparent in the latter part of the count, where the pleader attempts to charge appellant with encouraging the theft. The indictment charges him with encouraging Z. Rubotton to commit the crime of theft—an entirely different person to the one

charged with committing the theft. Brown v. State, 11 S. W. Rep., 1022; Favor v. Robinson, 46 Texas, 204.

As to the second objection to the indictment, we admit the pleader followed the form laid down in Willson's Criminal Forms, but it does seem to us that if the part of the indictment charging appellant with advising and encouraging the theft is not a distinct count, then there is but one count in the entire indictment. It says: "And the grand jurors aforesaid, upon their oaths aforesaid, do further present in and to said court," etc. This language is suitable and applicable to a separate and distinct count. Would not the proper language be "and the grand jurors further present that Deat Holt," etc. This objection to us seems well taken, although we confess that we know of no authority on the subject. It seems to us that the language, "do further present in and to said court," implies the beginning of a new count and separation from that part of the indictment which precedes. With these observations, we submit that the conviction could not be legally had, and that appellant's motion in arrest of judgment should have been sustained. Appellant also filed a motion for a new trial, which was overruled, and to which ruling defendant duly excepted. The errors complained of below were urged in said motion, and they were all excepted to on trial with perhaps one exception.

The record shows that after the evidence was in, and the counsel for both State and defendant had argued the case, the court read his charge to the jury, and that the court, without objection from State's counsel, submitted to the jury the first count in the indictment only, to wit, the count charging defendant with receiving stolen property, and as the jury were about to retire, defendant's counsel moved the court to exclude all evidence from the jury and instruct them to return a verdict of not guilty as the first count in the indictment was fatally defective. The court considered the motion and refused to grant it, but withdrew his charge to the jury entirely, and wrote another charge and submitted a different offense as charged in third count and on which defendant was convicted. Defendant excepted to the action of the court as shown by bill of exceptions number 1.

It seems to us that this action of the court was wholly unauthorized by law and reason. The State had made and had rested its case on the first count. The action of the court, without objection from State's counsel, was an election to stand on first count in the indictment. The jury had received the law from the court. The appellant was then entitled to a verdict on that count, and the effect of the charge was a waiver by the State of the other two counts in the indictment. The State had elected to stand on the first count in the indictment as effectually as if a dismissal had been made as to the other two counts in the indictment. Dalton v. State, 4 Texas Crim. App., 333; Parks v. State, 29 Texas Crim. App., 597; Powell v. State, 24 S. W. Rep., 515.

After an election has been made, either expressed or implied, the State

was bound by it. The two offenses charged in first and third counts are entirely distinct crimes, although connected with same transaction. After an election has been made, defendant is entitled to a verdict on the particular count on which the State relies. As to the case at bar, a verdict of not guilty on the first count would not have barred the offense charged in the third count, if the action of the court is correct. On the other hand, a verdict of not guilty on third count would not have barred the offense charged in first count, although the jury had been charged, and although the indictment may have been perfect. If the court's action here is correct, then a man may be tried as many times on the same indictment as there are counts in the indictment. If submitting a single count in the indictment is not an irrevocable election by the State, then could defendant plead former acquittal of the counts not submitted in the counts charged at the time he was convicted on the count submitted? The State could try a man on one count, and if there was an acquittal it could then say there has been no election and put defendant on trial on other counts in the indictment. It is true in this cause the court says in the bill that the charge was not given manually to the jury. We take it that be that as it may the principle of law is the same. The jury had been charged and the court had no right to withdraw the charge. Williams v. State, 35 Texas Crim. Rep., 183.

No objection was made to the charge, either by appellant or State. The withdrawal of the charge was not for correction or modification, but for the purpose of withdrawing the offense charged from the jury. If the court had a right to withdraw the charge after submitting it to the jury, would he not have the right to resubmit the same charge? If this right existed, would he not have the right at any time to withdraw the charge and admit additional evidence in the case, and then submit same charge again? To put an extreme case, if this right existed could not the court withdraw the charge, even after the jury had agreed on a verdict, and submit a different count to the jury? If the right of the court be conceded to withdraw entirely from the jury an offense after it has been submitted, there is but little limit to power of the trial court. The door is thrown open to fraud and oppression if there should be judges who would be disposed to act in this manner. We do not charge any improper motive whatever to our honorable district judge. His character and integrity are above reproach. However, in this case, after he had withdrawn the charge, as shown by the bill of exception, he offered to permit either the State or appellant to offer new evidence and to reargue the case. This is in direct conflict with Williams v. State, supra. This is an illustration of the evil that might result from this power of the judge. If this power was given the court, then at any time the State finds out it has not sufficient evidence, it can withdraw the charge, reopen the case, admit new evidence, reargue the case, and the court recharge the jury. Appellant insists that the submission of the first count in the indictment was equivalent to an acquittal on the other two counts. He had been in jeopardy in those two counts, and when the State aban-

doned them and relied on first count, he was entitled to an acquittal on the two counts not submitted.

Again, appellant submits that a fatal error was committed by the court in permitting Z. Rubottom to testify that in May or June, 1897, about nine months prior to the alleged offense, appellant advised and encouraged him in several conversations to steal from his father W. F. Rubottom. Z. Rubottom testified over defendant's objection "that he stole $40 in gold, and prior to that time, in several conversations, appellant asked him if his father was not rich, and if he did not have a great deal of money, and he replied not; and appellant asked him if his father ever gave him any money, and he replied very little; and appellant told him that if he were in his place he would help himself. The first conversation was in January or February, 1897, and he had several conversations between that and June, 1897," The witness detailed all the facts leading up to the theft of this $40 in June, 1897. The court says in explaining the bill, that "this evidence was admitted as being in its nature the inception of a series of acts and conversations resulting in the final theft charged," and in explanation of conversations defendant had afterwards with Z. Rubottom, and further on to show that in subsequent conversations that it was appellant's intent to induce Z. Rubottom to steal the money charged in the indictment. Take in this connection the charge of the court as shown in the bill of exceptions number 2, where the court tells the jury what effect should be given this evidence. He tells the jury this evidence already complained of was admitted for the purpose of determining appellant's knowledge and intent in his connection, if any, with the money described in the indictment. This charge was excepted to at the time, and brought to court's attention on motion for new trial. If abstractly correct, it was a charge on weight of the evidence in this case, as it virtually told the jury that they could find that appellant had an evil intent in the crime charged because he had been guilty of another crime nearly a year before this. It seems to us that the court's explanation of the purpose of the evidence, and his charge as to what it could be considered for, is sufficient to show the fatal error of this evidence. This evidence had no connection with the crime charged. It was nine months prior thereto, and at a time when Will Holt and Ell Carter were in Arizona. The only part of this $40 transaction, if any at all, that was admissible was the fact that Z. Rubottom stole the $40, and afterwards informed appellant of that fact.

The fact that appellant advised him to steal it would throw no light on subsequent conversations with Z. Rubottom, except to prejudice the minds of the jury, and to make them believe that because appellant had been guilty of a crime nine months before, he was guilty of the crime charged. In our opinion this evidence, intensified by the court's charge, was a violation of all the rules of criminal evidence. It permitted the proof of a distinct offense to show that appellant was guilty of another offense, and was also calculated to prejudice the jury and prevent a fair trial on legal evidence. The charge of the court intensified the error, as

it told the jury that appellant's guilty connection with a distinct offense was evidence showing an evil intent in regard to the crime charged, and was also on the weight of the evidence. Nixon v. State, 31 Texas Crim. Rep., 205; Musgrove v. State, 11 S. W. Rep., 927; Williams v. State, 6 S. W. Rep., 318.

We insist that this evidence is incompetent, and that it was highly prejudicial to appellant and was calculated to mislead the jury.

The court also erred in permitting the State to prove that on the morning after the alleged theft, after defendant Ell Carter separated, Will Holt and Ell Carter were arrested that evening twenty-three miles west of Abilene on their way to Arizona. The fact of the flight of Ell Carter and Will Holt, after they had separated from appellant, is clearly incompetent evidence. The court explains the bill by saying it was admitted to corroborate Z. Rubottom. If this evidence is admissible to corroborate Z. Rubottom, then an accomplice can always corroborate his evidence by the acts of his associates after the crime has been committed. An accomplice can always manufacture something that occurred afterwards in order to corroborate himself. The jury may have considered this flight of Will Holt and Ell Carter as evidence of their guilt and as evidence of a conspiracy between them and appellant to induce Z. Rubottom to commit the theft charged. The jury may have considered the flight of these two parties in connection with appellant's trip to San Angelo, and it may have had considerable weight with the jury as to whether or not appellant's explanation was true. If their flight was admitted, then any declaration they made would also be admissible against defendant, or in his behalf. It seems to us that this is clearly an error, and that it was such an error as was calculated to injure appellant. Jump v. State, 11 S. W. Rep., 627; Willey v. State, 3 S. W. Rep., 570; Estes v. State, 5 S. W. Rep., 176.

The appellant also requested a charge on possession of stolen property and reasonable explanation of the same in special charge number 1, which the court refused, as shown by bill of exception number 6. The appellant, when arrested by the sheriff, and in reply to his question, told him without hesitation or evasion that he had $100 in gold, and told him where it was and how he came by it; that he got it from Ell Carter, who won it from Z. Rubottom, etc. This explanation, if true, and it was brought out by the State, was entirely consistent with appellant's innocence of the crime charged. See evidence of H. B. Cook, sheriff. The State was bound by the explanation, and we insist that appellant was entitled to the charge. It is true that appellant did wrong in gambling; but that is no sufficient crime to send a boy to the penitentiary. He had always borne a good character in the community in which he lived, as shown by numerous witnesses. The witness Z. Rubottom was a confessed thief, who had stolen many times before, and also a confessed burglar. Wheeler v. State, 34 Texas Crim. Rep., 350.

The appellant further insists that material error was committed by the court in permitting Will Holt, a brother of defendant, to testify

when on trial the day before in a companion case, that he failed to take the witness stand and testify in his own behalf. The bill of exception shows that counsel went up to the court and told him that if this witness was compelled to testify to this fact it would necessitate putting defendant on the witness stand, as it called the attention of the jury to the fact that defendant had a right to testify in his own behalf. It may have been that defendant's counsel should have relied upon the bill and kept defendant off the witness stand, but it seems to us that after the evidence was introduced there was no escape from it. Necessarily the jury would have wondered why defendant did not take the stand and would have considered it against him. This was an ingenious way for the State to call attention of the jury to the fact that appellant had failed to testify. It was just as effective as if counsel for the State had argued it to the jury, and was doubtless offered for this purpose. It in no way weakened, contradicted, or explained the testimony of the witness Will Holt, and was wholly irrelevant to the case.

The court also materially erred in his charge to the jury on the law of principals. This error was called to court's attention in supplemental motion for new trial.

The court in effect told the jury that if they believed Will Holt, Ell Carter, and defendant conspired together to induce Z. Rubottom to commit the theft, etc., then the act and declaration of one would be the act and declaration of the other. Will Holt had been acquitted. The court. thereby told the jury that all that Z. Rubottom testified Will Holt said and did was evidence against appellant, although a jury had acquitted Will Holt. It seems that the case of Paul v. State, 12 Texas Criminal Appeals, 346, is in point. It is true that the parties there were indicted for the specific crime of conspiracy, but it appears to us that the principle is the same. Before any declaration or act of Will Holt was admissible, a conspiracy must have been formed. If this conspiracy had been formed, then Will Holt was an accomplice to theft; but the jury declared he was not. If Will Holt's declaration at the time all three were present, west of the college, as testified to by Z. Rubottom, occurred, then Will Holt was necessarily a party to the conspiracy. His acquittal made his declarations, if any, inadmissible against defendant.

After appellant was convicted, and Ell Carter, appellant's codefendant, was placed on trial, Z. Rubottom testified in substance, "that shortly after he stole the $90 he had a conversation with Ell Carter alone, and Ell Carter asked him where he got the $90, and if he had not stolen it, and he told Ell Carter that he had not stolen it, but that he had sold a half interest in the newspaper to his father, and that was where he got the money." This was set up in supplemental motion for new trial, and appellant makes the affidavit, supported by the affidavit of his attorney, who heard the evidence. The State did not contest or deny the truth of the fact that Z. Rubottom had so testified. Appellant fully accounted for why the evidence was not brought out on his trial, as he knew noth-

ing of the conversation, and the witness Z. Rubottom was an exceedingly hostile witness, and was kept in jail where no one could talk to him, etc. The evidence, if true, shows conclusively that there was no conspiracy to induce Z. Rubottom to steal his father's money. The evidence tends strongly to show that the boys thought the money belonged to Z. Rubottom. The evidence corroborates appellant's testimony as to Z. Rubottom claiming to own an interest in the newspaper. It is further a significant fact in this case that at no time does Z. Rubottom testify that the appellant or his codefendants ever said anything about where or from whom he was to get the money. This evidence also tends strongly to show that the alleged conversations between appellant and Z Rubottom never occurred. Certainly the State is not permitted to say that the evidence is not probably true when it comes from the very witness on whose evidence they rely for a conviction.

This conversation necessarily occurred just before the $350 was taken. Appellant testified in his own behalf, denying firmly any facts tending to show that he induced Z. Rubottom to steal the money. He firmly denied any knowledge of the $40 theft in May, 1897. If this conversation with Ell Carter be true, it shows almost conclusively that all the conversations testified to by Z. Rubottom just before the alleged theft were necessarily untrue. There seems to us no doubt as to the great materiality of this evidence, and if there was anything suspicious about the evidence the State would have shown it on the hearing of the motion for a new trial. In fact there could be nothing suspicious about it. As the witness was guarded in jail, and appellant had no opportunity, so far as the record shows, to converse with him, or to in any way induce him to modify his evidence, and certainly if any such opportunity had occurred the State would have shown it on hearing of the motion. Appellant strongly insists that the court materially erred in not granting a new trial, on account of this new evidence.

We realize the fact that a court should be careful in granting new trials on alleged newly discovered evidence, but this is certainly an extraordinary case. The new evidence does not come from appellant's friends or associates, but from his worst enemy, and from one who has the greatest motive to send him to the penitentiary. It comes from one who has bought his liberty from the crimes of theft and burglary by giving testimony in this case. We earnestly contend that the court's failure in this case to grant a new trial was such an error that should reverse this case. Brown v. State, 13 Texas Crim. App., 59; Mann v. State, 44 Texas, 642; Moore v. State, 18 Texas Crim. App., 212; Johnston v. State, 22 S. W. Rep., 595; Zedlitz v. State, 26 S. W. Rep., 725.

After the opinion affirming the judgment was handed down, these same attorneys filed a motion for rehearing based upon the errors discussed above in their brief, but in which motion there are no additional authorities cited.

*W. W. Walling* and *Mann Trice,* Assistant Attorney-General, for the State. [No briefs found in the record.—Reporter.]

HENDERSON, JUDGE.—Appellant was convicted of being an accomplice in the crime of theft, and his punishment assessed at confinement in the penitentiary for a term of two years, and he prosecutes this appeal.

The theory of the State tended to show that the $350 alleged in the indictment was stolen from W. F. Rubottom by his son Z. Rubottom; that the same was stolen from the bedroom of the owner on Saturday night, the 12th of February, 1898. Rubottom was a boy about 18 years old, in his father's employ, and slept at his father's house. Appellant, Deat Holt, Ell Carter, and Will Holt it is claimed were particeps criminis with appellant in advising and encouraging him to steal said money. Will Holt was an older brother of appellant, and Ell Carter was a neighbor boy. The State's case mainly depends on the testimony of Z. Rubottom, who testified substantially to the alleged theft, and to the advice and encouragement given him by appellant and Ell Carter. He testified to two prior thefts from his father, in which appellant and Ell Carter participated, as follows: One of $40, some nine months before the theft in this case, and one of $90 about a month before. His testimony tended to show that these boys made a tool of him to steal his father's money, and then proceeded to win or procure it from him under the guise of a game at cards. The witness details the circumstances connected with the prior thefts and the advice given him by appellant and Carter, and how they won the money from him which he had stolen at their suggestion. The testimony of this witness as to this particular game shows that appellant and Carter suggested that he should steal some more money from his father, and that Will Holt and Ell Carter were going to Arizona, and they would invest it for him; that he finally agreed to steal the money. For the purpose of hurrying him up to commit the theft, on the pretext that Ell Carter and Will Holt were going to start to Arizona on Friday, February 11th, they said they would stay over until Monday, the 14th, if he would promise to get the money. He further states that on February 12th, about an hour by sun, Ell Carter and defendant came to the front yard of his father's, and said Will Holt and Ell Carter wanted to leave, and were waiting for him to get some more money, and if he did not get it pretty soon they would leave anyway. They said that Will Holt was at Merkel waiting for Ell Carter. In this connection Ell Carter suggested to witness Z. Rubottom that he get the money and play cards, and get even on what he had lost. Witness told them he did not care to play cards, but would rather let them have it to invest. Ell Carter was to sleep at defendant's house, and he was to come up and let them know if he got the money. Defendant's house was 150 to 200 yards distant from his father's. About 9 o'clock at night they came again, and called witness out, and asked him if he was pretty sure to get the money, and he said he would try; and they said they would wait around the place awhile, and if he did not come out in an hour or

two they would be at Deat Holt's house. He succeeded in stealing the
money from his father's room, where he was asleep, about midnight.
When he got the money he went up to Deat Holt's house, and waked
him and Ell Carter up. When he waked the boys, defendant advised him
to play cards, and said he would stock the cards and help him (witness)
to win back all his losings. The boys got up, and went up to his father's
barn, and got a lamp and counted the money. They began playing,
Deat Holt dealing the cards, and he and Ell Carter playing the game.
Sometimes the game fluctuated, but before day Ell Carter had won all
of his money. He asked him to let him have some of it back, but he
would not, and told witness if he got into trouble about it he would help
him out if he could. The money was shown to be $230 in gold, the gold
being in $20 pieces, except one $10 gold piece, and the balance in cur-
rency. The money was missed by W. F. Rubottom on Sunday morning,
February 13th. It appears that his father suspected Z. Rubottom, who
finally admitted to him that he had gotten the money. He was arrested
on that evening at Buffalo Gap, where the theft occurred, and taken to
Abilene to be lodged in jail. On the way they met Deat Holt returning
from Abilene. On the following Wednesday, Deat Holt was arrested at
San Angelo. On his arrest he admitted that he had $100 in gold of the
money, which he had deposited with a party in Abilene, before he left
Buffalo Gap. This money, in $20 gold pieces, was recovered. Ell Car-
ter was arrested about thirty miles west of Abilene, in a hack, with Will
Holt and a party known as "Tennessee," then on their way to Arizona.
From him was recovered $294—$100 in gold and the balance in cur-
rency. Will Holt, it seems, was tried before appellant, and was ac-
quitted. Ell Carter was tried after appellant, and convicted. The State
relied on a number of circumstances to corroborate the witness Z. Rubot-
tom, which are not necessary here to be stated.

The first question presented by the assignments of error arose on the
action of the court in charging the jury on the various counts in the in-
dictment. The indictment contained three counts: The first count
charged the theft of the money by Z. Rubottom, and that appellant was
a receiver of the same, knowing that the same had been stolen; the second
charged appellant with the theft of said money; the third charged appel-
lant as an accomplice in the theft of said money, to wit, that the same
was stolen by Z. Rubottom, and that appellant before the theft had ad-
vised and encouraged said Z. Rubottom to steal the same. After the evi-
dence was all in, and the argument had been made, the court read its
charge to the jury, which submitted alone the first count in the indict-
ment, thus eliminating the other two counts from the consideration of
the jury. Thereupon appellant moved the court to instruct the jury to
bring in a verdict of not guilty, as the first count was defective. The
court's attention being thus called to the defect in the first count, in
that it failed to allege the ownership of the stolen property, while the
jury were yet in court, and before he had delivered the possession of his

charge to them, he recalled the submission, and prepared a new charge, predicated alone upon the third count in the indictment, thus eliminating from the jury altogether the first and second counts. Appellant objected because by the action of the court the first and second counts had already been dismissed and eliminated, and it was incompetent for the court at that stage of the case to recall its action, and rehabilitate the case on either of said dismissed counts. We differ with appellant as to his contention. The jury were not in possession of the charge of the court, and had not retired to consider the case, at the time the objection was made and when the court recalled its action. All of the counts had been before the jury up to this time, and the case tried fully upon all evidence adduced as to each, and certainly, until the case had been fully submitted and the jury had retired to their jury room with the charge of the court, it was competent for the court to recall its action as to the submission of any particular count. And when the court's attention was called to the fact, no matter how, that the submitted count was defective, and the conviction could not be maintained upon it, it was within the province of the court at this juncture to revise its action, and to submit the case upon any other good count, eliminating altogether from the consideration of the jury the count upon which the case had previously been submitted. No possible injury in this action could result to appellant. There was no step that he had taken in the meantime which was calculated to imperil or injure him, and, in our opinion, the action of the court violated no legal principle involved in a fair and impartial trial of appellant.

Nor did the court err in overruling appellant's motion in arrest of judgment. The fact that in writing the name "Rubottom" so that it might have been read "Rubotton" in one place in the count upon which he was convicted was not calculated to mislead or confuse anybody. The name "Rubottom" had previously been properly spelled, and the letter "m" at the termination of the name written out in full, previous to where it is claimed it was written "Rubotton," and he was referred to as the "said Rubotton."

Nor is the objection well taken to the third count, on the ground that it did not contain an allegation of the theft of said property. The count is in accordance with the approved authorities, and the allegation "that the grand jurors further present," etc., was not the beginning of a new count, and could not be so construed. It was a part of the third count.

Appellant reserved a bill of exceptions to the action of the court limiting the effect of the testimony in regard to the sums of $40 and $90 that had been taken by Z. Rubottom prior to the taking of the money mentioned in this indictment. The objection is that the charge is upon the weight of the evidence. The charge, under an unbroken-line of decision in this State, is a correct enunciation of the law, and the court did not err in giving the same. Whenever extraneous crimes are introduced in evidence before the jury, and there might be danger of a conviction for

these extraneous crimes, the court should limit the effect of such testimony for the purpose for which it was introduced. The court did this in the charge complained of.

Appellant "objected generally to any acts and declarations of Ell Carter after he had separated from defendant; and thereafter the State proved that, after defendant and Ell Carter separated, the said Ell Carter proceeded to near Merkel, and then he and Will Holt and the boy named 'Tennessee' were arrested about twelve miles west of Merkel, a distance of about twenty-three miles from Abilene, on February 13, 1898." This was objected to, because these matters occurred after the separation of the parties. There are no declarations of any of the parties set out in the bill as having been admitted against appellant. It was competent to show the arrest of the parties, and the place of their arrest.

The defendant introduced the witness Will Holt, who testified that he had been previously acquitted of this offense, and testified at length in regard to the circumstances detailed by the accomplice, with the evident purpose of contradicting the testimony of the accomplice. On the cross-examination of said Will Holt, he was required to answer that he had failed to testify in his own behalf when he was upon trial. This was objected to, because it would compel the defendant to take the witness stand in his own behalf. There is no merit whatever in this contention.

Appellant also excepted to the action of the court in permitting Z. Rubottom to testify in regard to the $40 that he had stolen from his father, and that prior to that time defendant had in several conversations advised him to steal the money from his father. This testimony was clearly admissible. These acts and conversations and agreements between Z. Rubottom, defendant, and others continued over several months, from May to the following February, showing a system and plan and concerted scheme. See Hennessey v. State, 23 Texas Crim. App., 340. It may also be stated that the court limited the effect of this testimony in his charge.

Appellant requested a special instruction to the effect that the jury should have been charged with reference to any explanation that he may have made with reference to his possession of the $100 of the stolen money. The appellant made no explanation consistent with his innocence. The testimony throughout, from beginning to end, shows that he was cognizant of the whole transaction, and was a particeps criminis, and if Z. Rubottom committed the theft appellant was cognizant of that fact, and assisted in beating said Z. Rubottom out of the entire amount in the gambling transaction, after they had agreed that the money should be taken to Arizona and there invested. If he obtained the money by the gambling transaction, or if he obtained it as a gift from Ell Carter, it was not an innocent explanation, because at the time he so received it, in either manner stated, he was guilty as an accomplice to the theft. There could be no innocent explanation of his possession of the money in question, in view of his guilty participation in the agreement and advice before referred to.

Appellant also complains of the action of the court permitting evidence of the fact that, when he was first informed of the arrest of Z. Rubottom for this offense, he "tucked his head," and looked like he had done something wrong. Upon objection, the opinion of the witness that the defendant looked like he had done something wrong was stricken out, and the jury instructed to disregard it, but the evidence that he "tucked his head" was permitted to stand. This action of the court was correct. The defendant was not under arrest, and his action should be admitted for whatever it is worth.

We are of opinion that the evidence is amply sufficient to support the conviction. The accomplice made out the case clearly and conclusively, and, so far as this character of testimony can prove a case, it is sufficient. The corroboration is ample, under both phases required by the statute. The judgment is affirmed.

*Affirmed.*

HURT, Presiding Judge, absent.

### ON MOTION FOR REHEARING.

HENDERSON, JUDGE.—The judgment in this case was affirmed at a former day of the term, and now comes before us on motion for rehearing. Appellant contends that this court was in error in holding that the testimony introduced by the State, showing that Will Holt was arrested twenty-three miles west of Abilene on the day after the alleged theft, was admissible, because he says that this arrest of Will Holt showed that he was then engaged in flight, and that it was an act of a coconspirator, brought to bear against the defendant after the object of the conspiracy had been accomplished. We treated this question in the original opinion, and we there held that the testimony embraced no act or declaration of a coconspirator in regard to the subject matter of the conspiracy, but merely showed the arrest of Will Holt. It is now urged, however, that this arrest, after the conspiracy, showed his flight, and was illegal, and was a material circumstance against the appellant. If this contention be sound, and it is not without authority (see Jump v. State [Texas Criminal Appeals], 11 Southwestern Reporter, 461), then we reply that, according to the testimony in this case, the conspiracy between the parties was not at an end with the commission of the theft. The record shows that the perpetration of the theft was in pursuance of a conspiracy engaged in by defendant, Ell Carter, and Will Holt to have Z. Rubottom steal the money from his father, and that he was to deliver the same to said parties, and they were to take it to Arizona, and invest it for him; and when arrested the parties had evidently some of this same money with them, en route to Arizona. And if it is claimed that the arrest of Will Holt and Ell Carter at Merkel, en route to Arizona, showed flight, and was an act of said parties, liable to be used against appellant, then we say that said act of going to Arizona was embraced in the conspiracy.

Appellant also reiterates his contention with reference to the theft of

$40 stolen by Z. Rubottom from his father in May, 1897, and he insists that the court is in error in stating that there was a series of conversations after this between appellant and Z. Rubottom up to the time of the alleged theft, which occurred in December, 1897; and he says that the record shows that appellant was absent from the State from May or June, 1897, until some time in December, 1897, and that this $40 theft was not a part of the system; and the case of Hennessy v. State, 23 Texas Criminal Appeals, 340, does not apply, as there was no connection between the $40 theft and the $90 theft and the $340 theft. It is true that after the $40 theft in May or June, 1897, appellant was absent from the State until some time in December; but it does appear, if the testimony of Z. Rubottom is to be believed, that appellant suggested the $40 theft, and after its commission he knew of same, and how it was committed. When the subsequent thefts of $90 and $340 occurred, the matter of the $40 theft was revived and discussed, and it was insisted by appellant that Rubottom steal the money from his father as he had previously taken the $40. We think the testimony in relation to this matter is sufficient to make it admissible in evidence as bearing on the theft of the $340.

Appellant says that we failed in the former opinion to pass on the correctness of the court's charge on the law of principals. The court instructed the jury on this subject as follows: "Therefore you should not consider for any purpose, as against the defendant Deat Holt, any act or declaration of Will Holt or Ell Carter, unless you should believe from the evidence that defendants Will Holt and Ell Carter had conspired and agreed together to fraudulently induce and encourage Z. Rubottom to steal his father's money. If they did so conspire, then the act or declaration of one is that of each of the others until the completion of the object of conspiracy, but no longer." He says that this law is correct as an abstract proposition, but it has no application to this case, because he says that Will Holt has been acquitted of the charge, and that his acquittal renders any act or declaration of his whatsoever inadmissible as against one of his codefendants, because another jury has decided that he was not a party to the conspiracy; and he refers us to Paul v. State, 12 Texas Criminal Appeals, 346. It was there held that, if one of two joint conspirators should be acquitted, the record of such acquittal could be introduced in evidence on the trial of a subsequent conspirator. This was based on the principle that if two are charged with a conspiracy; and one is acquitted, the other must be acquitted also, though he be guilty of doing the act charged, for it would be no conspiracy, however otherwise it may be a crime. Dever v. State, 37 Texas Crim. Rep., 396. It is true, the court, in passing, say that "where one of several joint conspirators has been acquitted, the acts and declarations in furtherance of the common design are inadmissible as evidence against the other defendants, because, if he was not a coconspirator, his acts and declarations could not be binding upon him." But this matter was not before the court. We think that where a party is charged with a substantive offense not a con-

spiracy, and it appears that the same was in pursuance of a conspiracy, the acts and declarations of one shown to have been engaged in the conspiracy are admissible in evidence, notwithstanding such coconspirator, whose declarations are sought to be admitted, has previously been acquitted. We would further remark, in regard to this charge, that the objection thereto is found in the motion for a new trial; and it does not show that Will Holt had been acquitted, so that the question is not raised.

Appellant also states that we failed to discuss his motion for a new trial on the ground of newly discovered evidence. This newly discovered evidence would simply serve to impeach the witness Z. Rubottom, and new trials are rarely granted to obtain testimony for the purpose of impeaching a witness. The motion for rehearing is overruled.

*Motion overruled.*