PAUL LANDRY v. THE STATE.

No. 13387. Delivered November 5, 1930.
Rehearing Denied February 24, 1931.

The opinion states the case.

*Vickers & Campbell,* of Lubbock, and *Williams & Bell,* of Childress, for appellant.

*A. A. Dawson,* State's Attorney, of Austin, for the State.

LATTIMORE, JUDGE.—Conviction for murder; punishment, five years in the penitentiary.

The penalty in this case takes out of it the necessity for considering the attack made on the indictment in appellant's brief.

In his brief appellant raises first the question of the sufficiency of the testimony. The general rule adhered to by this court in deciding this question, is that if there be evidence in the record which, if believed by the jury, would reasonably support the conclusion of guilty, the judgment will be upheld. Brister v. State, 97 Texas Crim. Rep., 395, 262 S. W., 82; Cross v. State, 100 Texas Crim. Rep., 88, 271 S. W., 621; Clark v. State, 90 Texas Crim. Rep., 613, 237 S. W., 260. As said in Addison's case, 3 Texas App., 40: "With the facts this court [appellate court] has but little concern, except to see * * * that there is a sufficient amount of legal evidence to support finding of the jury."

This killing took place at night near the town of Flomot. Deceased, appointed constable of his precinct two weeks before he was killed, was on his way home alone in a Ford touring car, and was shot near a bridge over a ravine. Some witnesses said they heard four shots. One witness testified that she heard five. Those persons first getting to the scene found the car of deceased sitting "quartering" across the road. The lights of the car were still on, and deceased was described as sitting under the wheel of the car with one foot on the clutch and the other on the brake, his body kind of slumped, his hat lying just behind the car. His pistol was sticking back between his legs, the barrel protruding and warm. There were four empty shells and one loaded one in said pistol. Three bullets seemed to have been fired from inside the car, one going through the left front door, one through the right-hand corner of the windshield, and one through the cushion on the right-hand side of the back seat. Deceased was shot through the head, the bullet entering about the lower part of the right ear, ranging up and coming out about an inch or more above the left ear, the right side of the face being badly powder burned. The right side of the hat brim of deceased was also much powder burned, and the knot on the hat band on the left side was shot off as the bullet went through said band. Dr. Trawick who examined the body of deceased swore that the shot through the head caused instant death; that one receiving such wound would not be able to do anything after receiving it. This fact is nowhere questioned in the record. Two doctors examined the body and both said that in their judgment deceased was shot through the head with a small pistol, probably a 30 or 32 caliber. The pistol of deceased was a 38 caliber pistol. Witnesses who got to the scene soon after the shooting saw what appeared to be two fresh sets of tracks under the bridge referred to. The ground where the deceased's car stood was hard.

According to the State's theory appellant, W. F. Allen and Harmon and Adolph Mosely were all connected with the killing. They were arrested and the shoes taken from the feet of appellant and Allen were

placed in the tracks found under the bridge, and according to the testimony of State witnesses they fitted said tracks. The shoes of Allen were worn or broken across the ball of the shoe, and the tracks of one set showed the same defect across the ball of the shoe. Appellant, Allen and the two Moselys were at Allen's drug store that night when deceased went there with Dr. Sherman to get some medicine. A few minutes later deceased was in Trice's store where Sam Jones came in with a watch he wanted to set. Deceased set it for him with the watch of Mr. Cooper at 7:30. Jones swore that a few minutes later he went to Allen's drug store and found it closed, which was earlier than it was usually closed. Clements, justice of the peace, also a barber,—testified that at something like eight o'clock deceased left his place to go home, got in his car and backed out and left. In a few moments the Gunn boys also left, and inside of ten minutes they were back with news of the homicide. Witnesses who examined the road running west from said bridge testified that just west of the bridge mentioned they found car tracks which left the highway and turned north about a half mile from said bridge. At this turn they observed that the right-hand rear tire of the car was worn smooth, but that the other tires had good treads. Following this road north to another turn, they observed the same tracks, and also at a point east where the road turned again they observed the same tracks, and again at another turn where the road intersected the Flomot-Quitaque road. They found the same impressions at other points where the ground was soft. These witnesses came back to Flomot, to the Allen hotel run by appellant's co-defendant Allen, and at which hotel appellant was making his home, and found in front of same a Dodge coupe which had a smooth worn casing on its right rear wheel, and casings with good treads on the other three wheels. They ran the car back and forth and testified to the similarity of the tracks made at that time, to those seen by them on the road examined. This Dodge coupe belonged to Harmon Mosely, one of appellant's co-edefendants, who was a son-in-law of Allen. Appellant took the stand in his own behalf and testified that on the night in question after Allen closed his drug store, he, Allen and the two Moselys got in said coupe and went out the Quitaque road north from Flomot, and then turned east to the home of one Barnes where they ate crackers and cheese and drank beer for an hour or more, and then came back to Flomot. In other words appellant connected his movements that fatal night with those of Allen and the Moselys, swearing in effect that where Allen went after closing his store, appellant went, and where Harmon Mosely's Dodge coupe went after the closing of said drug store, he, appellant, also went. The place on the Quitaque road where appellant claimed they turned east to go to the house of Barnes, is shown on the map introduced in evidence to be south of the place

where the witnesses who claimed to have tracked the car mentioned, said it came back to the Flomot and Quitaque road.

In addition to the above, the testimony showed that the deceased had arrested Harmon Mosely a week before this killing, and refused to take the kind of bond Allen offered for Mosely; that Allen got angry and called deceased the names set out below. A witness swore that Allen presently came out from where deceased and Mosely were, and as he came out Allen said he would kill the G—d d—d s-of-a-b. Another witness swore that he heard Allen say he would show the s—n of-a-b that he was not as smart as he thought he was. Still another witness swore that he heard Allen say he would kill the s—n of-a-b-h, as Allen came out of the place where deceased and Mosely were. Judge Clements, justice of the peace, swore he heard deceased tell Allen he was going to file a complaint against him also, and that Allen called deceased a low down dirty dog. This same witness heard Mosely tell deceased that if he thought anything of himself he would be better off at home than in town meddling with other people's business. He also swore that on the night of the killing and shortly before same deceased had filed a complaint against Allen, Harmon Mosely and the sheriff, Claude Warren, who was a witness for the defendant on this trial. Mr. Baker swore that on Saturday before the appointment on Monday of deceased as constable, witness drove up to a filling station where this appellant was, something was said about Monday being the day deceased would be appointed, and appellant said "If he does, the s-n of a b-h will be bumped off." A witness also testified that on December 2nd, after the killing on the night of November 28th, he went to the home of Harmon Mosely and got from Mosely's wife a 32 caliber pistol which showed to have been recently discharged. Dr. Sherman testified that he left Flomot that night at 7:15 and drove to Quitaque in thirty minutes, heard of the shooting fifteen minutes later and at once drove back to Flomot, which he would supposedly reach in another thirty-minute period. Judge Clements testified that while watching for Dr. Sherman to come from Quitaque he saw a car coming down the Quitaque road which began to honk the horn some one hundred or one hundred and twenty yards north of the drug store and kept up an almost continuous blast of the horn up to the drug store. Thinking perhaps it was the doctor intending to signal the druggist to meet him at the drug store, witness crossed over and met the car in front of Allen's drug store, and found its occupants to be appellant, Allen and the two Moselys.. No apparent reason was given upon the trial for their thus advertising the fact that they were coming into Flomot on a different road from that which. led out to where deceased was killed. Dr. Trawick said that he examined the body of deceased closely and found only one other place on same, beside the head wound,—that the right wrist of deceased was bruised as though some one had held deceased by

said wrist. It was shown that parties leaving Allen's drug store going north could have driven around in the town of Flomot and gotten back on the Floydada road to the point where the killing occurred. ·

These facts are set out at some length because the lack of evidence seems appellant's main defensive theory. We have not discussed the testimony introduced for appellant which his eminent counsel ably insist in their brief overthrows the State's case. The decision on facts in cases of conflict is for the jury. We have set out as accurately as we can the testimony which to us seems to support the jury's decision on the following points: First, that the killing was not a suicide; second, that there were threats by Allen and appellant toward deceased; third, that there was a motive on the part of Allen and the others for the killing; fourth, that the facts strongly· supported the conclusion of the presence of Allen and appellant at the time and place of the homicide, also that some one used a 32 caliber pistol; fifth, that facts supported the theory that a car with casings exactly like those on Mosely's car went the Floydada road from where the killing occurred west to Gunn's corner, north to Moore's corner, east to Webb's corner, thence down the road to where said car turned into the Quitaque road, and from that road same could have gone to the house of Barnes; sixth, the testimony that the wound in the head of deceased was made by a bullet from a pistol smaller than that of deceased, and similar in size to one found freshly discharged in Harmon Mosely's house a few days after the killing; seventh, testimony showing that the instant paralysis following the shot in the head would overthrow any idea that the pistol of deceased was stuck by him between his legs, barrel out, after the shot through the head was fired; eighth, the facts showing a bruise on the wrist of deceased, made as though by some one holding same, which would be natural if deceased tried to use his pistol against one or more persons at or around his car just before he was killed; ninth, the other fact supplied by the testimony of appellant, viz: that he was with both Allen and the Moselys wherever they were at the time of this killing.

After carefully considering and weighing these facts we are constrained to believe them sufficient, if believed by the jury to be true, to form the basis of a verdict of guilty. We see no necessity for setting out or discussing the lengthy testimony for the defense, the effect of which if accepted by the·jury would have been to overthrow the State's case. The jury are by statute made the exclusive judges of the credibility of the witnesses, as well as the weight of their testimony.

By two bills of exception complaint is made of the admission of testimony detailing the kind and character of certain automobile tracks which two or three hours after the homicide were seen and followed from near the bridge mentioned in various windings; also the kind and character of tracks made by a Dodge coupe which were examined by said parties the

same night, the witnesses expressing belief in the similarity of the tracks. We observe that Mr. Russell, the witness whose testimony is objected to, said he had had experience in tracking both men and vehicles, and "We could tell about the car tracks, and which way they turned." It is not necessary for such witness to measure such tracks as a predicate for the receipt of his opinion that they were similar. We note, however, that while this witness said that at certain places they saw the tracks they were following,—when he gave testimony as to the likeness of these tracks to the tracks of Mosely's car, he went no further than to say that in his opinion they were similar. This differentiates the instant case from that of Hester v. State (Texas Crim. App.), 51 S. W. Rep., 932, and Burkhalter v. State, 85 Texas Crim. Rep., 282, 212 S. W. Rep., 163. The rule contended for by appellant would deny a witness following tracks, the right to say they were followed, unless the witness had measured each succeeding track in the line of tracks so being followed.

Appellant used Calvin Barnes as a witness to testify that appellant, Allen and the Mosely boy came out to his house five miles northeast of Flomot at about eight o'clock on the night of the homicide, and stayed about an hour. If there could be any objection to the State eliciting from this witness what the party did in the way of eating and drinking during their stay at his house, which we do not believe to be a sound objection, the error was cured by the fact that appellant took the stand as a witness in his own behalf and swore on his direct examination what the party did in the way of eating and drinking while at Barnes' house, and that they did the things about which Barnes had testified, and which were objected to. McLaughlin v. State, 109 Texas Crim. Rep., 307, 4 S. W. (2d) 54.

Complaint is made of the testimony of two doctors who examined the body of deceased, and each of whom swore that from their examination they concluded that deceased was shot through the head with a small bullet, either a 30 or 32 caliber. Dr. Sherman testified as follows: "I judge it to have been made with a 32, or possible smaller bullet. The pistol you hand me now is a 38 calibre. In my judgment that is not the size bullet that made the wound in Stegall's head. The shell you hand me now, is a 32, and looked like the bullet that made the wound."

Objection was made to the testimony of the doctors upon the ground that same was a conclusion, and they were not shown to be sufficiently qualified to give their opinions. Dr. Sherman also testified as follows: "To some extent I am familiar with the various sizes and calibres of pistols. In my practice I have had some experience in observing and treating gun shot wounds, but not a great deal of experience along that line. From my experience and observation of various calibre of guns and

pistols, I think I can tell about what size calibre bullet that made the wound I saw there on Stegall's head."

Dr. Trawick said: "I have had quite a little experience in examining wounds of that character, and am familiar with the various sizes and calibres of guns and pistols. From the examination I made of the wound found on the deceased, in my judgment it was made with a 30 or 32 calibre bullet."

Under all the authorities, the competence of an expert is a question primarily addressed to the discretion of the trial judge. Underhill's Cr. Ev., Sec. 189; English v. State, 85 Texas Crim. Rep., 450, 213 S. W., 632. Branch's Annotated P. C., Sec. 131, cites many cases on the question of when one is held competent as an expert. We think the objections to the testimony of neither witness were tenable. Regarding the particular objection addressed in the brief of appellant to that part of Dr. Sherman's testimony in effect that the shell shown him was a 32 calibre, and looked like the bullet that made the wound, this must be and doubtless was, viewed in the connection same appears in the quotation above, understood to be but the expression of the doctor's opinion that the shell shown him looked like the size of the bullet that made the wound. We see no material difference.

The witnesses testified that they took shoes from the feet of appellant and Allen after their arrest on the night of the homicide, and that said shoes were "fitted" into two sets of tracks found under the bridge near where the body of deceased was found after he was shot. Such testimony was admissible. Walker v. State, 7 Texas App., 264, 32 Am. Rep., 595; Guerrero v. State, 46 Texas Crim. Rep., 447, 80 S. W., 1001; Pitts v. State, 60 Texas Crim. Rep., 527, 132 S. W., 801. The parties testified to the presence of two sets of tracks under the bridge, one of which showed shoes broken across the ball, the other set made by a No. 8 shoe. Allen's shoes showed to be broken across the ball, and appellant's shoes were No. 8. The strongest fact regarding identity and fixing admissibility of this testimony was that said shoes "fitted" into the track found under said bridge. It was testified that Allen's shoe fit the track which had a broken place across the ball, and that Paul Landry's shoes fit the other set of tracks.

The State's theory based on its testimony, being that appellant, Allen and the Moselys conspired to kill the deceased and were together when he was killed, anything said or done by either of said parties prior to the homicide, tending to show animus, anger or ill-will toward deceased, was admissible, and upon the same principle could be justified the admission of previous threats, difficulties or quarrels, if any, by one or more of said parties with or toward deceased; and if the testimony fairly tend to show that the parties were acting together at the time of the homicide, it would be immaterial whether the prior threats, difficulties or

quarrels were by all of them together, or any one or more of them apart from the others. A co-actor in the consummated crime adopts and makes himself a party to what has theretofore been said or done by his fellow conspirators in furtherance of the common design. Smith v. State, 21 Texas App., 102, 17 S. W., 560; Rix v. State, 33 Texas Crim. Rep., 353, 26 S. W., 505; Holt v. State, 39 Texas Crim. Rep., 299, 45 S. W., 1016, 46 S. W., 829, and cases cited in Secs. 693 and 694, Branch's Annotated P. C. We regard it sound to say that appellant having unqualifiedly committed himself by his own testimony to being present with Allen and Mosely somewhere at the time of the killing, the jury might take this statement of his as true and within their discretion reject all else he said, and might add to that each fact and circumstance pointing to the guilt of Allen and Mosely in determining appellant's guilt. Hays v. State, 90 Texas Crim. Rep., 195, 236 S. W., 463.

Each of the other matters complained of by appellant in this record has been examined and considered, but in our opinion are not deemed of such character as to call for discussion.

The judgment will be affirmed.

*Affirmed.*

Hawkins, J., absent.

### ON MOTION FOR REHEARING.

HAWKINS, JUDGE.—On account of illness, the present writer was not present when appellant's motion for rehearing was argued. This has caused a very careful examination of the motion and also of appellant's original brief where it has been referred to in said motion.

In passing upon the renewed insistance that the evidence does not sustain the conviction, we must look to the State's testimony which must have been accepted by the jury as true. The analysis of the evidence in our original opinion is exhaustive and it would profit nothing to restate it, nor our conclusions therefrom.

We have examined all the other matters urged in the motion for rehearing and see no reason to change our view that proper disposition was made of the case originally.

The motion for rehearing is overruled.

*Overruled.*