W. R. JENNINGS v. THE STATE.

No. 15305.   Delivered May 18, 1932.
Rehearing Denied June 22, 1932.
Reported in 51 S. W. (2d) 341.

The opinion states the case.

*William L. Kerr,* of Pecos, for appellant.

*Roy I. Biggs,* District Attorney, and *Henry Russell,* both of Pecos, and *Lloyd W. Davidson,* State's Attorney, of Austin, for the State.

CHRISTIAN, JUDGE.—The offense is murder; the punishment, confinement in the penitentiary for thirty years.

The case was tried in Reeves county on a change of venue from Winkler county.

It was charged in the indictment, in substance, that appellant and W. K. Wilson, with malice aforethought, killed W. M. Laughlin by shooting him with a gun. A severance was had and appellant first placed upon trial.

It was the theory of the state that the homicide grew out of an attempt on the part of appellant and W. K. Wilson to control the illicit traffic in intoxicating liquor in Winkler county. Appellant was a deputy constable, and Wilson a county commissioner. Deceased was engaged in the illicit traffic in intoxicating liquor. Deceased's widow testified that, approximately a month before the homicide, she heard a conversation between her husband W. K. Wilson, in which Wilson stated to deceased that, if he (deceased) would not pay him $50 a week, he (deceased) was not going to get along. Further, the witness testified that Wilson told deceased that, if he (deceased) got caught, he would have to stand the

consequences. Another witness for the state testified that, a few days before deceased was killed, appellant said to him (the witness) that he had caught deceased's brother with enough whisky to send him off for a while, and that he was going to "get" deceased in less than a week. We quote the testimony of this witness as follows: "Jennings said he had got Shorty (meaning Shorty Laughlin). That is Blackie's (deceased's) brother. He said he caught him with enough booze that would put him over the road for a while where he would stay kept, and says 'and I will get Blackie in less than a week and when I get him he will stay got.' * * * He said he had Shorty where he could put him away for a while where he would not be in the way. * * * At the time he made this statement about Blackie (deceased) he appeared to be serious. He said Blackie was in his and Peg Wilson's way."

This witness further testified that appellant stated to him that if he wanted to sell whisky he would have to see him (appellant) and W. K. Wilson, as they ran the town and whatever he (appellant) said "went."

Touching the facts and circumstances immediately surrounding the homicide, the testimony of the state was, in substance, as follows: Just prior to the homicide deceased and two other parties were in a cafe getting a cup of coffee. Deceased was in his shirt sleeves. As deceased walked to the door of the cafe, W. K. Wilson called him from a car in which he and appellant were sitting, with appellant on the side nearest the cafe. Deceased went to the car, placed his foot on the fender, and, folding his arms, leaned over into the door of the car. Deceased did not have a gun or any other offensive weapon in his hands. The parties engaged in conversation, in which some one asked deceased if he had a gun, and deceased replied: "What is that to you?" At this time deceased had not changed position. Some one in car fired a shot. When this shot was fired deceased had not changed position and was still unarmed. Deceased fell to the ground. He did not have a gun or any other weapon in his hand. Appellant pushed the door of the car open, stepped out, and shot deceased after he had fallen. Appellant then drove the witnesses who were present back. After deceased fell to the ground a pistol fell near him. One witness for the state testified that it appeared that the pistol was dropped from the car. This pistol belonged to deceased.

A witness introduced by appellant testified that he saw Wilson lean forward from the car and fire a shot at deceased after he had fallen to the ground, and that, immediately prior to the firing of this shot, appellant fired a shot at him. This witness said that the shots fired by appellant and Wilson were close together. Supporting the theory of the state that deceased's gun had been taken by appellant and Wilson prior to the homicide, and was "planted" by the body of deceased, the witness last mentioned testified as follows: "I said Peg Wilson then pitched out of the car a pearl handled nickel plated gun which was later picked up and

handed to me. The reason I did not pick it up was because I seen it pitched out of the car. I never wanted to have anything to do with it. I never touched the gun until it was handed to me. I could see in his car very easy from where I was. * * * The Laughlin gun was pitched out of the car and hit on the ground between Laughlin's (deceased's) arm and body. Laughlin was then down. That gun was pitched out and hit close to Laughlin's hips."

This witness testified further that after appellant had made the parties at the scene of the homicide stand back he (appellant) picked up the pearl handled gun and handed it to him (the witness). Witnesses for the state testified that immediately after the shots were fired appellant stated that he had killed deceased, some of the witnesses saying that appellant said: "That is Blackie Laughlin (deceased). I killed the s— of a b—."

Appellant testified, in substance, that he and Wilson drove to the cafe for the purpose of requesting deceased to move his car which was parked in a manner violative of a city ordinance; that Wilson called deceased to the automobile and advised him that he would have to move his car; that deceased cursed him and Wilson and pulled a pistol out of his pocket; that as he (appellant) pulled his pistol deceased fired at him, the bullet just grazing his head and going through his hat brim; that a shot was fired from behind him out of the car; that he opened the door and fired a shot at deceased; that deceased ducked and fired another shot at him; that he then fired another shot at deceased, and deceased fell, with his gun in his hand; that he got out of the car, took the gun out of deceased's hand, and delivered it to an officer. Appellant denied that he had made any threats against deceased, and denied that he had gone to the cafe for the purpose of killing him. He admitted that he had arrested deceased's brother for selling whisky, but denied that he had made any threats against deceased in connection with this arrest. Appellant admitted on cross-examination that he had stated to the grand jury that he did not hear or see Wilson fire any shots during the difficulty, and did not know whether or not Wilson had a gun on that occasion. We quote from appellant's testimony at this point as follows: "I admit that within four days after this homicide occurred I stated to the grand jury that I did not know whether Wilson fired a shot. I said that simply because I was in jail and Wilson was out. I say now to this jury that Wilson fired the shot that I think killed Laughlin simply because it is like this. I was framed all the way through. Wilson framed me—he run me into it. He just drove me into killing Blackie (deceased). I made the statement to the grand jury that I did not hear or see Wilson fire a shot because Wilson wasn't arrested and I was. I felt like Wilson should be in. I did not tell the grand jury the truth because Wilson had the pull of the country. I told Mr. Biggs (the district attorney) that I would tell him more later."

Over appellant's objection, the state was permitted to introduce in evidence numerous orders of the commissioner's court fixing the salaries of officials of Winkler county. It appears that in these orders it was provided that certain officers who were ordinarily entitled to fees were required to pay their fees into the treasury and accept in lieu thereof stated salaries. For example, seevral constables had their salaries fixed at $166 per month. In one order it was shown that an appropriation was made for the employment by one of the officers of a secretary or stenographer. This place was filled by the wife of one of the commissioners. Another order showed that not long before the homicide appellent was appointed deputy constable. It appears from these orders that W. K. Wilson, appellant's alleged coconspirator, voted in the affirmative when the question of paying salaries to various officers was submitted, and that, further, he voted for the employment of appellant. It is certified in the several bills of exception (2 to 12, both inclusive) that it was not shown that appellant was present when the orders were made, and, further, that no witness testified that appellant was aware that such proceedings had been had. Appellant objected to these orders on the ground that they were irrelevant, immaterial, and hearsay. It appears to have been the state's contention that the contents of the orders tended to show that Wilson, through the commissioner's court, was seeking to secure control of the law enforcement machinery of the county in order that he might control the illicit traffic in intoxicating liquor, and, further, that said orders tended to shed light on the theory of the state that Wilson and appellant entered into a conspiracy to secure control of the intoxicating liquor traffic in Winkler county.

Further, the state argues that such testimony fairly tended to raise an inference in favor of the existence of a motive on the part of appellant and Wilson to kill deceased, in view of the fact that deceased was a bootlegger and had refused to pay tribute to appellant and Wilson. We are unable to reach the conclusion that this testimony fairly tended to raise an inference in favor of the existence of a motive on the part of the parties involved. Further, we fail to perceive its relevancy and materiality on the question as to whether a conspiracy existed between appellant and Wilson to kill deceased. Conceding that the testimony was inadmissible, we are unable to reach the conclusion that, under the facts reflected by the record, it could have been prejudicial to appellant's rights. If the testimony of the state was to be accepted as true, appellant and Wilson acted together in firing the fatal shots at the time deceased was killed. Deceased, who was unarmed, was called to the car occupied by Wilson and appellant and shot down without having an opportunity to defend himself. Further, according to the testimony of the state, which the jury accepted, Wilson had attempted to force deceased to pay him tribute for selling intoxicating liquor in Winkler county. Appellant had threatened

to "get" deceased, saying at the time, in effect, that if intoxicating liquor was to be sold in Winkler county the permission of Wilson and himself must first be obtained, as Wilson ran the county. Again, on his cross-examination, appellant testified that Wilson had "framed" him and had driven him into killing deceased. Appellant's testimony raised the issue of self-defense. The orders in question appear to disclose no more than an extravagant course of conduct in dealing with the finances of the county, which in no manner reflected on appellant. Under the circumstances, we are constrained to hold that the bills of exception fail to manifest reversible error..

Bill of exception No. 13 relates to appellant's objection to the testimony of the wife of deceased to the effect that she heard W. K. Wilson request deceased, in the absence of appellant, to pay him $50 a week, or take the consequences of "being caught." This testimony was introduced by the state on the theory that it was the declaration of the co-conspirator showing the common design, purpose, and intent of all the conspirators. We quote from Branch's Annotated Penal Code, sec. 693, as follows: "When a couspiracy is shown, proof of the acts and declarations of co-conspirators is admissible to show the common design, purpose and intent of all the conspirators, whether such acts and declarations were made before or after the formation of the conspiracy, or whether the same were made before or after the defendant on trial entered into the conspiracy." See, also, Landry v. State, 117 Texas Crim. Rep., 396, 35 S. W. (2d) 433; Thompson v. State, 116 Texas Crim. Rep., 460, 33 S. W. (2d) 1067.

A coactor in the consummated crime adopts and makes himself a party to what has theretofore been said or done by a fellow conspirator in furtherance of the common design. Landry v. State, supra. In Cox et al. v. State, 8 Texas App., 254, 34 Am. Dec., 746, Judge White used language as follows: "To our minds, a great deal of the trouble, confusion, and discussion with regard to conspiracy, where two or more are charged with the commission of crime, might and can be obviated by keeping in mind these statutory provisions. If the parties can be identified at the time and place as joint participants in the commission of the crime, why the necessity of going behind that fact to establish a conspiracy to do the act already accomplished, and for which the law denounces them as principal offenders and liable to punishment as such? Why want a better predicate, or any further evidence even of a conspiracy, if their presence and guilty participation is already established? To us it seems too plain to admit of argument, that, when two or more are found acting together with an unlawful intent in the commission of an offense, the common design and acting together makes them ipso facto conspirators,— endows them as a body with the attribute of individuality,—merges the conspiracy to do the act in the act itself; and that the previous acts and

declarations of each or any such principal offenders in pursuance of the agreed plan, and tending to throw light upon it or the motive or intent with which it was committed, is and should be received as legal and admissible evidence against each and all, whether indicated, prosecuted, and tried jointly or separately."

Giving effect to the announcement of the decisions, we are constrained to hold that the testimony in question was admissible.

In the bill of exception last mentioned it is recited that at the close of the evidence appellant moved the court to instruct the jury not to consider the evidence for any purpose, and that the court declined to give such instruction, and refused to in any manner limit the consideration of such testimony by the jury to any purpose. In his brief appellant contends that if it should be conceded that the trial court was not in error in admitting the declaration in question, then in such event the court should have submitted an instruction limiting the consideration of said testimony to the purpose of motive and intent. It is unnecessary to determine whether it would have been proper to have limited this testimony. Appellant failed to object to the court's charge for its failure to so limit such testimony. No special instruction on the subject was presented. Article 658, C. C. P., requires that all objections to the charge of the court be made in writing, distinctly specifying each ground of objection. Article 666, C. C. P., provides that all objections to the charge and to the refusal or modification of special charges shall be made at the time of the trial.

It is recited in bill of exception No. 14 that appellant submitted a special instruction to the court in which the jury would have been advised to acquit appellant if they believed from the evidence that the codefendant Wilson actually committed the homicide while acting in his own self-defense. In qualifying the bill of exception the court stated that after the special charge was submitted to him he corrected his main charge, and considered that the main charge, as corrected, embodied the substance of the special instruction. It does not appear that appellant excepted to the corrected charge. Appellant did not except to the court's qualification to the bill of exception, and is bound thereby. If appellant was not satisfied with the charge after it was amended, it was incumbent upon him to file further objections thereto. Simms v. State, 117 Texas Crim. Rep., 88, 34 S. W. (2d) 1098; Jackson v. State, 103 Texas Crim. Rep., 252, 282 S. W., 808; Hall v. State, 97 Texas Crim. Rep., 158, 260 S. W., 878.

The opinion is expressed that an election on the part of the state was not required. The proof showed that both appellant and Wilson shot deceased. They were present and acting together at the time. It was appellant's theory that he and Wilson acted in self-defense. The court submitted an instruction on the law of principals. Under the circumstances, to have required the state to seek a conviction predicated on the

act of Wilson in firing upon deceased on the one hand, or on the other, upon appellant's own act would not have been proper.

A careful examination of all of appellant's contentions leads us to the conclusion that reversible error is not presented.

The judgment is affirmed.

*Affirmed.*

The foregoing opinion of the Commission of Appeals has been examined by the Judges of the Court of Criminal Appeals and approved by the Court.

### ON MOTION FOR REHEARING.

LATTIMORE, JUDGE.—Appellant complains in his motion of the refusal of a requested charge, in effect, that "the bare presence of the defendant Jennings, at the time of the commission of the offense, if any, would not render him guilty with the real perpetrator, if any, of the offense." There is no testimony in this record that appellant was a mere spectator, or that all he did was to be present. The state's testimony made him an active participant, and, according to his own testimony, he shot two or more times at deceased in the course of the difficulty. Nor is there anything in the record supporting any theory that appellant's only connection with the offense was a failure on his part to give alarm, and that a special charge asked should have been given, in effect, that his failure to give alarm would not of itself render him guilty. There were a number of people present when the shooting took place. The "alarm" was sounded when the pistol was fired. The fact that later and before the grand jury appellant made a written statement which was repudiated by him when a witness on this trial,—in which he made false statements as to the acts of his companion in connection with the shooting, would not furnish any basis for the giving of either of the special charges.

We have again considered the bill of exception complaining of the introduction of certain orders of the commissioner's court, in matters not apparently affecting any issue in this case, as held by us in the original opinion. We feel sure there must have been in the mind of the trial court some belief of the relevance of these matters, but again confess our inability to perceive same. However, we also adhere to our former statement that we can not see how, to any extent or in any degree, said matters could have harmed appellant.

The facts seem to show an ugly murder, and to the zeal and ability of counsel appointed to represent appellant may be credited the fact that his punishment was not a heavier penalty. The original brief as well as that on motion for rehearing, lead us to express our appreciation of the earnest and able defense conducted without pay, but simply in the discharge of a duty imposed by appointment.

The motion for rehearing will be overruled.

*Overruled.*