JOHN KINCHELOE v. THE STATE.

No. 22926. Delivered November 15, 1944.

The opinion states the case.

*Art Schlofman,* of Dalhart, and *Clem Calhoun,* of Amarillo, for appellant.

*Ernest S. Goens,* State's Attorney, of Austin, for the State.

BEAUCHAMP, Judge.

The appeal is from a sentence of ten years in the penitentiary on a charge of murder.

Appellant is the father of the deceased, Clark Kincheloe, who was thirty-one years of age and married. The lengthy statement of facts in the case reveals a long and continuous disagreement between the father and son resulting in conflicts of opinion expressed by physical force on numerous occasions. According to the appellant and his wife, who testified in his behalf, the son had given them trouble in the matter of forgery and stealing since he was about thirteen years of age. He had served two terms in the penitentiary, one in Texas and one in New Mexico. Apparently he had not been long released from the New Mexico penitentiary and, according to the appellant's testimony, he was in trouble again. The father had assisted him in former troubles but was not planning to do so at the time of the killing.

The immediate difficulty and killing was on Christmas Eve and Christmas Day, culminating in the son's death at about two thirty in the afternoon. The family, which consisted of several children, married and unmarried, had not seen Clark Kincheloe for some time. He came with his wife and little daughter to the home of appellant where he lived on a farm near Dalhart, arriving a few days in advance. It is indicated that he assisted his father in some work on the place. On Christmas Eve day the father and son with their wives went to Dalhart in a car together. The son asked the father to buy him a pair of boots which he declined to do but did give him a pair of gloves. Arguments had taken place between them during the day. On the way home in the late afternoon a difficulty, which can only be accounted for by the intoxicated condition of both, resulted in a fist fight in which the father was considerably the loser. Eventually they arrived at the farm home. After the father had demanded several times that the son leave his house and never darken the door again, Clark and his wife and daughter made preparations to leave but before doing so Clark began complaining of a severe pain in his arm. This is unexplained and the defense sought to show that it was feigned. Anyway it resulted in an agreement from the father to let him stay over night. The next day was Christmas. Other children had come, and were coming. Mr. Allison, a neighbor, came over for a visit. With a desire to pacify the parties and bridge over the trouble, the wife of appellant sent for the other members of the Allison family who came with provisions which were consolidated with that in the Kincheloe home and they together prepared their Christmas dinner. There was a Christmas tree in the house, and they had whisky and made egg-nog.

Some time in the forenoon appellant with the deceased, Mr. Allison and others went for a brief duck hunt. Upon returning to the house the three men went to Dalhart where more whisky was purchased and they returned to their home at some time before dinner was served. Appellant went into the sitting room and there remained. Dinner was served after two o'clock. Egg-nog had been served during the day and apparently after they returned from Dalhart. The family and the guests gathered around the table while appellant kept his seat in an adjoining room. The State introduced Mrs. Allison as a witness, who told of going into the room and having a conversation with him immediately preceding the shooting. She also gave an account of the shooting. The wife of appellant also went to his room and about this time he became very much enraged at the son. Just why he did at this particular time is not explained even by the

appellant himself. It is testified by witnesses for appellant that the son had been making some threats against the father in the dining room and within his hearing. This is denied by State witnesses and the father does not claim to have heard such statements and to have acted because of them. The son finally went into the room where appellant was and approached him. The evidence is much in conflict as to some of the things that occurred at that time. Mrs. Allison's testimony was to the effect that the son tried to pacify the father who became infuriated, jumped on the bed, withdrawing a pistol from under it, and shot Clark who fell with his head against a piece of furniture near the Christmas tree. Two or three shots were fired into the body after he fell. Appellant and his wife tell a different story which raises an issue of self defense. This was submitted to the jury and the issue concluded against him by their finding. Death resulted from the gun shot wounds instantly.

Several issues are presented by the bills of exception. After the court's charge was prepared and presented to the attorney exception was lodged at that part which submitted the issue of self defense. They also presented special requested charges on the subject which the court declined to give. The court then reformed the charge, in an attempt to comply with the objections lodged against it. After this no further objections were urged until a motion for new trial was prepared. Upon this question appellant presents his most insistent bill of exception but it is our conclusion that when the charge was reformed it was then accepted by counsel for the party on trial. The issues which they attempted to raise in the motion for new trial came too late. If displeased with the charge after the court made the changes he should have again excepted to it. Art. 658 C.C.P. Note 61 p. 237; Hall v. State 260 S. W. 878; Kincaid v. State 10 S. W. (2d) 725; Jennings v. State 51 S. W. (2d) 341; Davis v. State 56 S. W. (2d) 449; Baker v. State 62 S. W. (2d) 132; Stanton v. State 71 S. W. (2d) 287.

Bills of Exception Numbers Two and Three will be considered together. While appellant was testifying in his own behalf he was asked whether or not he had told his son to leave his house any time during the day of the homicide and again if he had said anything to him about leaving after he came into the room, immediately preceding the shooting. The State objected to each of these questions on the ground that it was a leading question. The objection was sustained by the court and it is shown in each case that the witness would have given an answer to the effect that he did ask the son to leave. It does not appear

to this court that the questions were leading or that the objections made by the State should have been sustained. Thus is presented a rather difficult question to which we have given much consideration.

On a former trial the jury had assessed a penalty of six years in the penitentiary. Only under very unusual and clear circumstances would we be able to say that the error of the court would not call for a reversal. The entire record must be considered. Mrs. Allison was the chief witness for the State. In detailing the occurrence of the shooting she says that when Clark came into the room and approached his father, suggesting that they talk their trouble over, Mr. Kincheloe asked him to call his mother. As the mother came into the room the appellant said "Mama, this boy has got to leave." The mother replied "No, not until he finishes his dinner." Then it was that appellant kicked the son in the stomach. The shooting took place immediately thereafter. We are confronted then with the State objecting to the admission of testimony the same as that which had come from its chief witness. On the other hand the appellant complains that the court did not let him make a statement positively in conflict with that which he thereafter made. We quote from the father's testimony as follows: "The night before was the only time that I had told him to leave, or ordered him to leave there. I did not say a word to him about leaving on the day that he was killed. I drank with him some that day, and I guess it was out of the same bottle. We had a mutual friend there, viz; Bob Allison, and everybody was friendly there that morning and I got along all right with Clark that morning, and he did not say a word out of the way to me, and had not said a cross word to me since the fight the night before, but we hadn't made up, nothing said about making up, but we had just passed it up. I was perfectly agreeable with Clark and he with me when he went to town that morning. We went down there to Pete Ford's whiskey joint, and Clark got out and went in there, and I guess he got the whiskey; I never did see it until it was presented here in court. We did not go anywhere else there in town; they did not get me any whiskey there; it was a perfectly agreeable trip, and Clark sat by me and I sat by him. Also, when we went hunting that day, everything was agreeable. We had been drinking some by the time we got back home, * * * * *."

The foregoing testimony was given on cross examination by the State while the bills complain of refusal of the court to admit his contradictory statement on direct examination. In

view of the admission by the State of the evidence sought to be introduced and complained of in the bills and in view of the fact that such evidence, if given, would be directly in conflict with appellant's evidence before the jury, we are unable to conclude that this case ought to be reversed. We can not conceive of the evidence making an impression on the jury in any way favorable to the appellant and it forcefully denies the statement in the bills to the effect that he would have answered that he told the son to leave on the very day of the killing and immediately preceding the same.

Bill Number Four complains of the admission of a statement made by Mrs. Allison to her husband to the effect that she told him that "Mr. Kincheloe was going to get his gun and kill Clark and to go in there." The evidence is found in the following statement by Mrs. Allison: "When Mr. Kincheloe started toward the bed, as I have stated, Mrs. Kincheloe went to screaming for me to go and get Bob, and so I left and went into the dining room, and told Bob that Mr. Kincheloe was going to get his gun and kill Clark, and to go in there. I went through this door right here (referring to plat) I don't know just how many feet from Mr. Kincheloe I was at the time I called Bob, but just went through this door and called him, and the doors were open; I probably called in a pretty loud voice; I was excited, I guess. When I went out and called Bob, he was sitting at the dining room table; then I went on through this door and into the kitchen, and then came back out here on to this little porch and stood there until Clark fell, and then turned and came back into the kitchen." From the foregoing evidence we are not able to reach the conclusion that the statement made was not in the presence of appellant. She was just inside the door of the dining room, a matter of a very few feet, and it was immediately preceding the shooting. There is no dispute about the fact that the appellant did the very thing which Mrs. Allison told her husband he was about to do. The error in this testimony does not appear.

Bill of Exception Number Five complains of the statement by Mrs. Allison, as a witness, to which the court sustained an objection, and also to a remark of the District Attorney in further presenting a question to her. On the former appeal of this case (175 S. W. (2d) at the botton of page 596, Section 8) this court held that particular subject matter to be prejudicial. It will be noted, however, that the statement in the Bill now before us does not include the objectionable matter heretofore ruled inadmissible. There is nothing in the instant case to indicate

appellant's cruelty to his wife. It would only indicate previous difficulties between the father and son and to these the father testified at great length. No error is reflected by this bill.

It will be hard to conceive of a more unnatural and horrifying murder than that for which appellant has been found guilty. The defense proved a bad reputation for the son through many years. Specific instances of disrespect and trouble which the son had caused the father were related. Some witnesses testified as to the good reputation of appellant but this was strongly contradicted by other witnesses produced by the State. The father's own story of forty years of drunkeness sufficiently leads up to and accounts for a picture which we have refrained from relating in its fullness. The jury has concluded all questions of fact against him and the father must suffer the penalty.

The judgment of the trial court is affirmed.